UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF DAVID KENNETH DRUMM | 15-MJ-1104-DLC<br><br>18 U.S.C. § 3184<br>(Extradition of Fugitive from Foreign Country to United States) |

## COMPLAINT

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1. In this matter I act for and on behalf of the Government of Ireland.

2. There is an extradition treaty in force between the United States and Ireland, the Treaty on Extradition Between the United States of America and Ireland, U.S.-Ir., July 13, 1983, T.I.A.S. No. 10813 ("the Treaty)," as supplemented and amended by the Instrument and Annex as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed June 25, 2003, U.S.-Ir, July 14, 2005, S. TREATY DOC. NO. 109-14 (2006) ("the Instrument and Annex").

3. Pursuant to the Instrument and Annex, the Government of Ireland has submitted a formal request through diplomatic channels for the extradition of David Kenneth DRUMM ("DRUMM").

1

4. DRUMM is charged with 33 criminal offenses as set out below, committed within Ireland's jurisdiction. An arrest warrant was issued for each separate charge. Accordingly, on June 27, 2013, a Judge of the District Court in the Dublin Metropolitan District issued 33 warrants for DRUMM's arrest for the following charges, the factual basis for which is explained further below:

*Offense 1:* Disclosure of information in an Interim Management Report, in purported compliance with Transparency Directive 2004/109/EC Regulations 2007 which is false or misleading in a material respect, in violation of Section 21 of the Investment Funds, Companies and Miscellaneous Provisions Act 2006, which carries a maximum sentence of five years' imprisonment;

*Offenses 2-17:* Giving of unlawful financial assistance by a company to a person for the purpose of, or in connection with, the purchase of shares in that company, in violation of Section 60 of the Companies Act 1963 (as amended), which carries a maximum sentence of five years' imprisonment, per offense;

*Offenses 18-24:* Forgery, in violation of Section 25 of the Criminal Justice (Theft and Fraud) Offences Act 2001, which carries a maximum sentence of ten years' imprisonment, per offense;

*Offenses 25-31:* Being privy to the falsification of a document as an officer of a company, in violation of Section 240 of the Companies Act 1990 (as amended), which carries a maximum sentence of five years' imprisonment, per offense;

*Offense 32:* Conspiracy to defraud, in violation of common law, as defined by common law in the English decision Scott v Metropolitan Police Commissioner [1975] AC 819, which carries a maximum sentence of an unlimited term of imprisonment; and

*Offense 33:* False accounting, with the intention of making gain or causing loss to another by making use of an account that is false, misleading or deceptive in violation of Section 10 of the Criminal Justice (Theft and Fraud) Offences Act 2001, which carries a maximum of ten years' imprisonment.

5. DRUMM is believed to be within the jurisdiction of this court at 73 Old Colony

Road, Wellesley, MA 02481.   DRUMM is currently subject to bankruptcy proceedings, now on appeal, in this District (15-CV-10184).

6. Julie Martin, an attorney in the Office of the Legal Adviser of the United States Department of State, has provided the Department of Justice with a declaration authenticating a copy of the diplomatic note by which the request for extradition was made and a copy of the Instrument and Annex between the United States and Ireland, stating that the offenses for which extradition are demanded are covered by the Instrument and Annex, and confirming that the documents supporting the request for extradition are properly certified, in accordance with Article VIII of the Annex to the Instrument, so as to enable them to be received in evidence.

7. The declaration from the Department of State, a copy of the diplomatic note from Ireland, a copy of the Instrument and Annex, and the certified documents submitted in support of the request, marked collectively as Government's Exhibit #1, are filed with this complaint in their original form and incorporated by reference herein.

*Factual Basis for the Offenses*

The warrants were issued on the basis of the following facts:

8. In January 2005, DRUMM was appointed Chief Executive Officer ("CEO") of the Anglo Irish Bank Corporation ("Anglo") as well as a member of Board of Directors. He resigned from the bank in December 2008.  In July 2011, the bank merged with Irish Nationwide Building Society to form a new company called Irish Bank Resolution Corporation.  In February 2009, the Irish Financial Services Regulatory

Authority ("IFSRA") filed a complaint with An Garda Síochána, Ireland's national police force, concerning a number of suspected malpractices within Anglo. In the course of the investigation, DRUMM was implicated in the alleged malpractices.

9. Anglo and its subsidiaries provided banking services in three financial areas, namely, business lending, treasury, and private banking. On September 2008, Anglo was listed on both the Irish and London stock exchanges, thus subjecting it to the rules and practices of those exchanges with respect to matters such as corporate governance, financial reporting, and disclosure. As CEO, DRUMM was obligated to ensure Anglo complied with these regulations.

10. Following the 2008 financial crisis, which involved the failure or near failure of several major financial institutions, the world's banking markets faced significant pressure due to heightened customer skepticism in the banking system. Irish banks, including Anglo, were greatly affected by the crisis, which led to Anglo actively endeavoring to maintain the market's confidence in its operation. As Anglo dealt with the global economic conditions, it also faced a significant problem related to Sean Quinn ("Quinn"), an Irish businessman and major shareholder in Anglo, and his ownership of Contracts for Difference1 ("CFD") on Anglo's shares. In 2005, Quinn began to build a CFD position in Anglo through the Portuguese-registered company

---

1 A Contracts for Difference ("CFD") is a financial instrument ordinarily used to gamble on a bank's share price. A CFD is a contract between two parties, typically described as "buyer" and "seller," stipulating that the seller will pay the buyer the difference between the current value of an asset and its value at contract time. If the difference is negative, then the buyer pays the seller instead. The main risk to the holder of the CFD is market risk, as the contract is designed to pay the difference between the opening price and the closing price of the underlying asset.

Bazzely V using nine brokers. At a meeting on September 11, 2007, Quinn informed DRUMM and Sean Fitzpatrick ("Fitzpatrick"), the chairman of Anglo, that he had taken out a substantial CFD position relating to the share price of Anglo, which amounted to 28% of Anglo's entire Ordinary Share Capital. DRUMM and Fitzpatrick were concerned by the extent of Quinn's holding in Anglo. As Quinn required funds to maintain the CFD, DRUMM instructed a bank employee to lend Quinn €140 million. Over the period from November 2007, until June 2008, there were a number of additional advances and payments to fund Quinn's CFD position. In 2008, the share price of Anglo dropped substantially in value and Anglo sought ways to unwind Quinn's CFD position.

*Offense 1:* *Disclosure of information in an Interim Management Report, in purported compliance with Transparency Directive 2004/109/EC Regulations 2007 ("the Regulations") which is false or misleading in a material respect*

11. Under Section 6 of the Regulations, Anglo was required to disclose a half-yearly financial report covering the first six months of the financial year. On May 7, 2008, Anglo published this report in purported compliance with the Regulations. The report stated that it, "included a fair review of important events that had occurred during the six months ending the 31st March 2008 and a description of the principal risks and uncertainties of the remaining six months of the financial year." However, this report did not disclose the CFD position built up by Quinn, an important event that resulted in substantial exposure of Anglo, thus violating Irish law. Further, because the issue of Quinn's CFD had not been resolved by March 31, 2008, it constituted a "principal

risk or uncertainty" for the following six-month period that should have been reported. DRUMM was fully aware of the CFD position, as witnesses can attest to his presence at the meeting with Quinn on September 11, 2007. Further, DRUMM was responsible for the non-disclosure of the matter on the financial report, as demonstrated by the fact that he signed the report's Responsibility Statement, which confirmed that the report's financial statements had been prepared in accordance with international accounting standards and provided a true and fair view of the assets, liabilities, and financial position of Anglo.

### *Offenses 2-17: Giving of unlawful financial assistance by a company to a person for the purpose of, or in connection with, the purchase of shares in that company*

12. In the months following September 2007, Anglo's share price dropped. Quinn was required repeatedly to fund margin calls2 due to the drop in share price. He sought assistance from Anglo in order to fund the margin calls between November 2007 and June 2008. Anglo lent money to Quinn's company which in turn lent to Bazzely V to fund the margin calls. On March 17, 2008, Anglo's share price fell significantly by 30%, exerting further pressure on Quinn to fund margin calls. This in turn created intense pressure within Anglo to deal with both the falling share price and Quinn's requests to fund the margin calls. In a meeting on March 27, 2008, which was attended by DRUMM, Quinn agreed he would buy 15% of the shares outright rather

---

2 CFD's are traded on margin, the leveraging effect of which increased the risk. A margin call is a trader's demand on an investor using a margin to deposit additional money or securities so that the margin account is brought up to the minimum maintenance margin. Margin calls occur when an account value's depresses to a value calculated by the broker's particular formula.

than dealing with the CFD, and the remaining 10% would be placed on the market. However, no purchasers were found to buy 10% of the shares.

13. By the end of May 2008, the share price fell again, so Anglo lent Quinn further funds of approximately €151,300,300 in order to fund the margin calls. On June 3, 2008, Quinn met with the management of Anglo, including DRUMM. At the meeting, Quinn requested a further €200 million because he feared he was going to breach his financial covenants with syndicate banks. Anglo initially refused this request, but later granted it in exchange for power of attorney over Quinn's CFD position, which was never invoked. Anglo's troubles were compounded in this period from April to July 2008 when the IFSRA exerted pressure on Anglo to rectify Quinn's CFD position. The bank officers also believed the CFD situation was affecting Anglo's share price.

14. DRUMM spoke to Quinn on July 10, 11, 14, 2008, in regard to the need to unwind Quinn's CFD position. DRUMM told Quinn that he had identified ten individuals, who would eventually become known as the "Maple 10," to purchase 10% of the share position accumulated by Quinn. The remaining 15% would be purchased outright by Quinn's family. Anglo lent Quinn's family members approximately €175 million to purchase the shares. The lending was issued despite the bank's awareness of Quinn's family's weak financial position, as demonstrated by the extensive lending to meet margin calls. The lending was not done in the ordinary course of the bank's business as it was motivated by the bank's attempt to unwind Quinn's CFD position

and to stabilize its share price. Quinn's family, his wife and five children, stated to Irish authorities that they were not initially aware that Anglo was loaning them money and that they never sought the loans.

15. DRUMM and Patrick Whelan ("Whelan"), the bank's Executive Director and Director of Lending, then approached each of the Maple 10 and offered them 1% of the bank's shares, together totaling the 10% of the shares that were attached to Quinn's CFD holdings. The ten customers were specifically chosen by DRUMM and other bank officers because of their perceived high net worth, their loyalty to Anglo, and their heavy reliance on Anglo for their lending needs. Each of the customers agreed to borrow €45 million from Anglo in order to purchase the shares as part of the arrangement orchestrated by DRUMM to unwind Quinn's CFD position.

16. Loan facility letters, dated July 10, 2008, were then sent to each of the Maple 10. Around the same time, loan facility letters were also sent to Quinn's family members to fund the purchase of the remaining 15% of the bank's shares held in Quinn's CFD. These letters were not issued in the bank's ordinary course of business. In fact, Michael O'Sullivan ("O'Sullivan"), the bank's Divisional Lending Director and a member of the bank's Credit Committee, provided a written statement to Irish authorities and explained the role of the Credit Committee, which was intended to ensure that each credit application, especially applications for loans over €5 million, underwent a thorough review by a number of bank officials. The loan facility letters were sent to the Maple 10 and the Quinn family before the Credit Committee had

even considered their supposed applications. The Credit Committee Applications created by DRUMM for the Maple 10 investors and the Quinn family members portrayed these loans as normal commercial transactions and included a security recourse to the borrower limited to 25% of the balance outstanding under the facility. The letters to the Maple 10 were inaccurate in that they suggested the loans were intended for a "multi-currency share dealing facility," when they were in fact intended solely for the purchase of the bank shares. Further, the letters inaccurately suggested that the borrowers approached the bank seeking the loan to buy the shares, when each of the Maple 10 was approached by DRUMM.

***Offenses 18-24: Forgery, in violation of Section 25 of the Criminal Justice (Theft and Fraud) Offences Act 2001***

***Offenses 25-31: Being privy to the falsification of a document as an officer of a company, in violation of Section 240 of the Companies Act 1990 (as amended), which carries a maximum sentence of five years' imprisonment, per offense***

17. The original set of loan facility letters, dated July 10, 2008, were sent to each of the Maple 10 investors. However, the Irish investigation revealed that seven further loan facility letters, dated July 17, 2008, were later sent to seven of the Maple 10 investors. The investigation concluded that the second set of loan facility letters was actually created in October 2008, and backdated to July 17, 2008, to give a false impression of contemporaneity. The second set of letters contained a number of changes from the first set of letters. For example, the first set of letters included a security recourse to the borrower limited to 25% of the balance outstanding under the facility. In the second set, the personal liability of the borrowers was limited to 25% of the balance

9

outstanding under the facility or to the value of the shares at expiry of the facility. The new insertion gave more favorable terms to the borrower and less favorable terms to Anglo. The effect was that in the event Anglo's share value became greatly inferior to the money loaned, Anglo would not be able to recover any part of the outstanding loan by personal recourse of the Maple 10 investor. This amendment to the loan facility letters constituted an interference with Anglo's entitlement to recover the value of the loan from the Maple 10 investors.

18. DRUMM was responsible for creating the above mentioned false loan facility letters. Moreover, DRUMM, by virtue of being the Chief Executive Officer at Anglo was an officer within the meaning of the Companies Act of 1990. As an officer of Anglo, he was privy to the falsification of documents (the loan facility letters) which affected the financial affairs of Anglo.

*Offense 32:* *Conspiracy to defraud, in violation of common law, as defined in the English decision Scott v Metropolitan Police Commissioner [1975] AC 819*

*Offense 33:* *False accounting, with the intention of making gain or causing loss to another by making use of an account that is false, misleading or deceptive*

19. Beginning in October 2007, DRUMM held weekly funding initiative meetings with senior executives of Anglo in order to identify potential sources of funding for the bank. The primary objective of the initiatives were to increase Anglo's corporate customer accounts in its balance sheet and financial statements for the half-year ending March 30, 2008, and the year ending September 30, 2008. The bank's employees were asked to approach other financial institutions and inquire if they

would ask their "non-bank" subsidiaries to place funds with Anglo, to enable the funds to qualify as corporate customer deposits as opposed to interbank placements.

20. In March 2008, after being approached by Anglo's employees, Irish Life and Permanent plc agreed to a series of "back to back" transactions with a total value of €750 million. The "back to back" transactions were circular in nature in that Anglo furnished €750 million to Irish Life and Permanent plc who then returned the monies to Anglo through their own corporate subsidiary, Irish Life Assurance plc. The transactions totaling €750 million were complete by March 31, 2008. Anglo then presented the €750 million transaction as a corporate deposit in the half-year balance sheet and financial statements dated March 31, 2008, as if it had come from the non-bank entity Irish Life Assurance plc. The bank intended this transaction to bolster its corporate deposits in order to support its funding requirements, as demonstrated by Anglo's record of this transaction as a corporate customer deposit in its financial statements.

21. In September 2008, according to Matt Cullen ("Cullen"), Anglo's Director of Treasury, DRUMM instructed Cullen to approach Irish Life and Permanent plc and request that they enter into a series of "back to back" transactions similar in nature to those that occurred in March 2008. The total of these transactions was €7.2 billion. Irish Life and Permanent plc agreed to Anglo's request. Anglo subsequently furnished approximately €7.2 billion to Irish Life and Permanent plc, who then returned the monies to Anglo through their corporate subsidiary, Irish Life Assurance

11

plc.  Again, Anglo presented the €7.2 billion as a corporate deposit in the year-end balance sheet and financial statements on September 30, 2008, as if the transaction had come from a non-bank entity.

WHEREFORE, the undersigned requests that a warrant for the arrest of the aforenamed person be issued in accordance with the Instrument and Annex and Title 18, United States Code, Section 3184, so that the fugitive may be arrested and brought before this court, "to the end that the evidence of criminality may be heard and considered."

_____
AMY HARMAN BURKART
ASSISTANT UNITED STATES ATTORNEY

Sworn to before me and subscribed in my presence this 5th day of October, 2015, at Boston, Massachusetts.

_____
Donald L. Cabell
United States Magistrate Judge